**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**RUBEN VICTOR CENTENO-BERNUY,**
**et al.,**

                                   **Plaintiffs,**                          **01-CV-0839A(Sr)**

**v.**

**BECKER FARMS, et al.,**

                                   **Defendants.**

---

## REPORT, RECOMMENDATION AND ORDER

            This matter was referred to the undersigned by the Hon. Richard J.

Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and

report upon dispositive motions.  Dkt. #4.


            Plaintiffs are four nonimmigrant agricultural workers suing their former

employer, Becker Farms, which is operated by Oscar and Melinda Vizcarra, for

violations of the Fair Labor Standards Act ("FLSA"), the Migrant and Seasonal

Agricultural Worker Protection Act ("AWPA"), New York Labor Law, New York Real

Property Law, New York Human Rights Law and for breach of contract.  Dkt. #71, Exh.

B.  The breach of contract action arises from alleged violations of the terms and

conditions imposed upon agricultural employers of nonimmigrant foreign workers

pursuant to the H-2A program set forth in 8 U.S.C. § 1188 and 20 C.F.R. § 655.100 *et*

*seq.,* which are commonly referred to as the Wagner-Peyser Act.

Currently before the Court is: (1) plaintiffs' motion (Dkt. #69), for summary judgment dismissing defendants' counterclaim alleging that plaintiffs breached their employment contract with defendants by leaving the job early and striking defendants' sixth and seventh affirmative defenses which allege that plaintiffs failed to meet the minimum productivity and quality standards set forth in the contract; and (2) defendants' motion (Dkt. #70), for summary judgment dismissing the complaint.  For the reasons that follow, it is recommended that plaintiffs' motion be **GRANTED** and defendants' motion be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Becker Farms is located in the Town of Hartland in Niagara County, New York.  Dkt. #71-2, ¶ 1.  The property totals approximately 340 acres, approximately 140 of which are used for farming.  Dkt. #71, Exh. M, p.32.  Becker Farms grows strawberries, raspberries, blueberries, cherries, sweet corn, vegetables, pumpkins and apples for sale to customers who pick such produce themselves or purchase the produce at Becker Farms' retail store.  Dkt. #71, Exh. M, p.32; Dkt. #71-2, ¶ 2.  Becker Farms also produces baked goods, jams, jellies and apple cider from its own produce, which it sells at the retail store on its premises.   Dkt. #71-2, ¶ 2.  In addition, Becker Farms hosts company picnics and organizes pig races, pony rides, a petting zoo and seasonal events, such as a "strawberry extravaganza," "raspberry jamboree," and "pumpkin fiesta," including a corn maze and haunted hayride, to attract customers to the premises.  Dkt. #69-3, ¶ 5; Dkt. #71, Exh. M, p. 37.  For example, Oscar Vizcarra

testified that the pumpkin festival, which runs during the weekends in September and October, drew approximately 5,000 to 8,000 people during 2001.  Dkt. #79-19, pp.6 & 10.  Sally Ann Kneepel, an employee at Becker Farms, testified that beginning in 1999, corporate picnics were scheduled approximately once a week during the summer.  Dkt. #79-23.

Becker Farms sells some of its apples to wholesalers such as Bucolo Cold Storage, H.H. Dobbins and Mayer Brothers.  Dkt. #71-4, ¶ 4; Dkt. #79-39; Dkt. #70-40; Dkt. #70-41; Dkt. #70-42.  These companies sell their product outside of New York.  Dkt. #112, Exh. 1.

Becker Farms has maintained a web site since August, 1998 which offers, *inter alia*, to ship apples, jams and jellies anywhere in the continental United States.  Dkt. #112, Exh. 1.  However, Melinda Vizcarra avers that during the time period relevant to this lawsuit, Becker Farms "did not deliver its produce, fruits, vegetables, baked goods, jams, jellies, or cider outside of New York."  Dkt. #71-4, ¶ 3.  Oscar Vizcarra also avers that Becker Farms did not "engage in any retail sales over the internet" between 1997 and 2001.  Dkt. #89, ¶ 11.  Becker Farms has also advertised on local radio stations which broadcast into Pennsylvania and Canada and through New York's Board of Tourism.  Dkt. #112.  However, Oscar Vizcarra avers that its advertising "did not target potential customers outside of the Western New York area or the borders of New York State."  Dkt. #89, ¶ 10.

Between 1996 and 2001, defendants requested permission and were subsequently approved to hire non-immigrant foreign workers pursuant to the H-2A program set forth in 8 U.S.C. § 1101(a)(15)(H)(ii)(a).   Dkt. #69-3, ¶ 8; Dkt. #71, Exh. D. This program permits agricultural employers to hire nonimmigrant aliens as workers if they first obtain a certification from the United States Department of Labor that there are insufficient domestic workers who are willing, able, and qualified to perform the work at the time and place needed and that the employment of these aliens will not adversely affect the wages and working conditions of domestic workers.  See 8 U.S.C. § 1188(a)(1).  To ensure that employment of H-2A workers does not adversely affect the wages and working conditions of domestic workers, regulations require that employers compensate H-2A workers at a rate not less than the higher of the federal minimum wage, the prevailing wage rate in the area, or the adverse effect wage rate.[1] 20 C.F.R. § 655.102(b)(9).  Numerous other regulations address, *inter alia*, payment of transportation and subsistence costs, housing, and record keeping.  20 C.F.R § 655.102(b).

Defendants hired four H-2A workers each year from  1996 through 2001. Aff. of Oscar Vizcarra, dated 4/29/2005, ¶ 3.[2]  Plaintiff Ruben Centeno-Burnuy was hired to work at defendants' farm as an H-2A worker during the 1997 through 2001

---

[1] The adverse effect wage rate is the minimum wage rate that the United States Department of Labor determines is necessary to ensure that wages of similarly situated domestic workers will not be adversely affected by the employment of H-2A workers.  20 C.F.R. § 655.100(b); 20 C.F.R. § 655.107.

[2] Although the Court received a courtesy copy of this document, it does not appear to have been electronically filed.

growing seasons.  Dkt. #69-3, ¶ 2; Dkt. #71-2, ¶ 9.  Plaintiffs Waldo Centeno-Burney

and Joel Efrain Pecho-Vivanco were hired to work at defendants' farm as H-2A workers

during  the 1998 through 2001 growing seasons.  Dkt. #69-3, ¶ 3; Dkt. #71-2, ¶ 9.

Plaintiff Aquiles Galindo-Buendia was hired to work at defendants' farm as an H-2A

worker during the 2000 and 2001 growing seasons.  Dkt. #69-3, ¶ 4; Dkt. #71-2, ¶ 9.


The Clearance Orders[3] issued by the the United States Department of

Labor incorporate the regulatory requirements, providing that:

> A copy of the Work Agreement and/or Job Order shall be
> posted in the labor camp and be made available.  A copy of
> the Job Clearance Order will be provided to the worker no
> later than the day on which the worker begins employment.
> The employer assures that the working conditions of this
> order comply with the applicable Federal and State
> employment related laws and agrees to abide by the
> regulations at 20 CFR 655.103, Assurances and 20 CFR
> 653.501.

Dkt. #71, Exh. D.  The Clearance Orders further provide that:

> (a) An hourly rate of not less than the Federal or State
> minimum wage, the current AEWR, the prevailing hourly
> rate, or the employer's hourly rate, whichever is highest, is
> guaranteed to the worker for the period of employment . . . .
> The employer agrees to pay all workers . . .  the . . . AEWR
> when it is established.

* * *

> (c) Employer will maintain adequate and accurate payroll
> records.  Workers will be paid weekly on <u>Friday</u> for work

---

[3] The Clearance Order for 1997 is NY0704064; the Clearance Order for 1998 is NY0708831; the Clearance Order for 1999 is NY0701326; the Clearance Order for 2000 is IT5365477; and the Clearance Order for 2001 is NY0142495.  Dkt. #71, Exh. D.  Although the Clearance Orders are not exactly the same from year to year, the substance of the quoted passages remains the same.

through <u>Thursday</u>.  A written statement showing the
employer's full name and address, the worker's social
security number, total hours of work offered, total hours
actually worked, total number of units, if piece rate, total
earnings for the pay period and deductions will be furnished
the worker on pay day.

Dkt. #71, Exh. D, Item #9.  In addition, the Clearance Order states:

(a) Employer agrees to reimburse inbound transportation
and subsistence expenses to each worker, or any person,
government agency or private organization which, on behalf
of the worker, has paid or advanced such transportation and
subsistence expenses, from residence, place of last
employment or place of recruitment to the job site after the
worker has completed 15 consecutive calendar days of
employment or 50% of the period of employment, whichever
is shorter, from initial date of need or from the day after
actual date of arrival of worker if later than the started date
to report.

(b) The employer assures that the employer bears and pays
the transportation related expenses, either directly to the
provider of travel or indirectly to reimburse the worker so that
the employee's weekly pay is not diminished below the
applicable Federal minimum wage required by Section 6 of
the Fair Labor Standards Act, 29 USC 206.

(c) Employer will provide or pay the cost of return
transportation and subsistence to each worker who
completes the employment period, or who is terminated for
medical reasons, or as the result of an Act of God, enroute
from place of employment to place of recruitment, except
when the worker has subsequent employment with an
employer who will bear the transportation expenses and who
is not returning to his place of recruitment.

Dkt. #71, Exh. D, Item #17.   Defendants also assured that the employees would be

provided with housing "in full compliance with the requirements of the U.S. Department

of Labor and Part 15 of the New York State Sanitary Code for Migrant Labor Camps."

Dkt.#71, Exh. D.

Defendants did not provide a copy of the clearance order to any plaintiff in any year in which they were employed pursuant to the H-2A program.  Dkt. #69-3, ¶ 18; Dkt. #69-11, p.115; Dkt. #69-13, p.179;  Dkt. #85-2, No. 2.

Defendants did not maintain daily records of hours worked by plaintiffs. Dkt. #69-3, ¶ 24.  Oscar Vizcarra testified that he would tell plaintiffs "this is the hours we want to work, this is what we're going to do" and expected them to "stay within those hours."  Dkt. #71, Exh. M, pp. 58, 63 & 66-68, 70.  At the end of the week, Oscar Vizcarra testified that the plaintiffs would then tell Oscar Vizcarra the number of hours they had worked that week and he would tell Melinda Vizcarra, who wrote the checks. Dkt. #69-10, pp.89-92; Dkt. #69-11, pp.94-97; Dkt. #71, Exh. M, p.80.  Other employees tracked their hours on a time sheet which they gave to Melinda Viczcarra at the end of the week.  Dkt. #71, Exh. M, p. 62.

Defendants obtained reimbursement from plaintiffs for their transportation costs from Peru to Becker Farms even though they knew that the H-2A program required the employer to pay transportation costs.  Dkt. #69-11, pp.200-03; Dkt. #69-13, pp.189-93.   Specifically, defendant Oscar Vizcarra testified at his deposition that he told the plaintiffs that he could not afford to bring them from Peru, so they agreed to repay the transportation costs.   Dkt. #69-12, p. 174.   He stated that he knew

> That I was supposed to pay for the transportation, but I just couldn't do it.  And they agreed they would help me pay for transportation.

Dkt. #69-13, p.191.

Eduardo Rodriguez, an employee of the New York State Department of

Labor, spoke with three of the H-2A workers while they were weeding during the

summer of 2000.  Dkt. #71, Exh. M, p.44.  They told him that they were happy and had

no problems.  Dkt. #71, Exh. M, p.45.  Oscar Vizcarra knew that Mr. Rodriguez was

speaking with the workers, but was not close enough to hear their conversation.  Dkt.

#71, exh. M, p.46.  Mr. Rodrguez also inspected the housing for the H-2A workers prior

to their arrival in 2001.  Dkt. #71, Exh. T.  Mr. Rodriguez testified that

> It looks like it's a real nice place to me.  Like apartments,
> with different rooms, with a living room.  And I remember
> they have TV's and rugs.  And it's a nice place to live in.

Dkt. #71, Exh. T, p.28.  Mr. Rodriguez further testified that the housing had smoke

detectors, fire extinguishers and first-aid kits – everything needed to pass inspection.

Dkt. #71, Exh. T, pp.31 & 73-75.  However, Oscar Vizcarra testified at his deposition

that plaintiffs complained to him about a plugged toilet, causing him to furnish plaintiffs

with

> a snake, Dran-O, the pressure thing that you put in there.
> And they said they tried, it worked only for a month.

Dkt. #71, Exh. M.  As a result, Oscar Vizcarra hired a construction company specializing

in sewage to dig out the septic system in the spring of 2001.  Dkt. #71, Exh. M.

Defendants were also aware of a problem with rodents.  Dkt. #79-18, pp.140-41; Dkt.

#79-21, pp.199-200.


Plaintiffs started speaking with Farm Workers Legal Services late during

the 2000 season and, upon their return to Becker Farms in the Spring of 2001,

maintained their own log of hours worked during the season.  Dkt. #79-6, pp.10-13; Dkt. #79-8, p.7.  They left Becker Farms on November 3, 2001, ten days prior to the expiration of their H-2A contract and planned return to Peru.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

_____Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982.   A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


Pursuant to Fed. R. Civ. P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also H.Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**FLSA Cause of Action**

Plaintiffs' first cause of action alleges violations of the FLSA.  Dkt. #71,

Exh. B.  Specifically, plaintiffs assert that defendants failed to pay them $5.15 per hour

for each hour worked; failed to pay plaintiffs at least the federally-mandated minimum

wage; failed to maintain records as required by 29 U.S.C. § 211(c); and failed to pay

overtime wages in violation of 29 U.S.C. § 207.  Dkt. #71, Exh. B.

Enterprise Engaged in Commerce

Defendants argue that plaintiffs cannot maintain an FLSA claim because

plaintiffs were not engaged in commerce and Becker Farms was not an enterprise

engaged in interstate commerce.  Dkt. #71-5.

Plaintiffs respond that there is at least a material question of fact as to

whether Becker Farms is an enterprise engaged in interstate commerce.  Dkt. #79-1.

Specifically, plaintiffs contend that defendants engaged in interstate commerce by

selling fruit to wholesalers who sold the product out of state; marketing their business to

individuals outside of New York; and maintaining an internet site.  Dkt. #79-1, pp.20-23.

The FLSA provides that "[e]very employer shall pay to each of his

employees who in any workweek is engaged in commerce or in the production of goods

for commerce, or is employed in an enterprise engaged in commerce or in the

production of goods for commerce . . . not less than $5.15 an hour beginning

September 1, 1997."  29 U.S.C. § 206(a)(1).  The FLSA also provides that

> no employer shall employ any of his employees who in any
> workweek is engaged in commerce or in the production of
> goods for commerce, or is employed in an enterprise
> engaged in commerce or in the production of goods for
> commerce, for a workweek longer than forty hours unless
> such employee receives compensation for his employment
> in excess of the hours above specified at a rate not less than
> one and one-half times the regular rate at which he is
> employed.

29 U.S.C. § 207.  Thus, to be subject to the FLSA, plaintiffs must be "engaged in commerce or in the production of goods for commerce" or "employed in an enterprise engaged in commerce or in the production of goods for commerce."

Commerce is defined as "trade, commerce, transportation, transmission, or communication among several States or between any State and any place outside thereof."  29 U.S.C. § 203(b). "Enterprise engaged in commerce or in the production of goods for commerce" is defined as an enterprise that –

> (i) has employees engaged in commerce or in the production
> of goods for commerce, or that has employees handling,
> selling, or otherwise working on goods or materials that have
> been moved in or produced for commerce by any person;
> and

> (ii) is an enterprise whose annual gross volume of sales
> made or business done is not less than $500,000 (exclusive
> of excise taxes at the retail level that are separately stated).

29 U.S.C. § 203(s)(1)(A).

Although the FLSA is to be construed liberally, Congress did not intend that the regulation of hours and wages should extend to the furthest reaches of federal authority.  *See McLeod v. Threlkeld*, 319 U.S. 491, 493 (1943).  Sporadic or occasional

shipments of insubstantial amounts of goods across state lines are insufficient to bring

an employee within the coverage of the act.   *Remmers v. Egor*, 332 F.2d 103, 104 (2d

Cir. 1964), *citing Mabee v. White Plains Pub. Co.*, 327 U.S. 178 (1946).  Accordingly, in

*Lamont v. Frank Soup Bowl, Inc.*, the Court found that a family-owned eatery in the

Bronx was not subject to the FLSA even though three people living outside of New York

affirmed that they purchased food from the restaurant.  No. 99 Civ. 12482, 2001 WL

521815  (S.D.N.Y. May 16, 2001).  The district court explained:

> there is no allegation that Frank's delivered food anywhere
> outside of New York or even advertised its food outside of
> New York.  There is also no evidence that Frank's received
> any direct shipments of supplies from outside the State of
> New York.  While it is true that people who live outside of
> New York may have eaten food prepared at Frank's, that
> fact alone cannot serve as evidence that Frank's prepares
> the food for interstate commerce.

*Id.* at *2.  In the instant case, in contrast, defendants produced apples which were

regularly sold to wholesalers who distributed them outside of New York.  Dkt. #112.  In

addition, defendants advertised their business through the New York state board of

tourism and offered, via their newsletter and website, to ship their products outside of

New York.  Dkt. #112.  This is sufficient to establish the first prong of the 29 U.S.C.

§ 203(s)(1)(A) requirement.


With respect to the second prong, defendants proffered a cash income

statement indicating total sales income of $493,821.52 for 1999.  Dkt. #71-4, Exh. A.

Defendants aver that the proper figure for purposes of this exercise is $450,961, an

amount which excludes income generated from government grants, government set

aside payments, refunds for Workers' Compensation insurance payments, bank

dividends and rental income from a home located on the premises.  Dkt. #92, ¶¶ 5-6.

Defendants argue that this revenue is not related to the common business purpose of

Becker Farms.  Dkt. #122, p.1.


Plaintiffs argue that the total income should be used.  Dkt. #111, p.2.  In

addition, plaintiffs note that defendants failed to include a payment from Mayer Brothers

for $7,002.98.  Defendants explain that this payment was included in the 2000 gross

sales figures because the check was not cashed until 2000.  Dkt. #82, ¶ 7.


The statute defines enterprise to include

the related activities performed (either through unified
operation or common control) by any person or persons for
a common business purpose, and includes all such activities
whether performed in one or more establishments or by one
or more corporate or other organizational units including
departments of an establishment operated through leasing
arrangements, but shall not include the related activities
performed for such enterprise by an independent contractor.

29 U.S.C. § 203(r)(1).  The regulations clarify that "the annual gross volume of an

enterprise must include any business activity in which it engages which can be

measured on a dollar basis."  29 C.F.R. § 779.258.  The regulations also state that:

The annual gross volume of sales made or business done of
an enterprise consists of its gross receipts from all types of
sales made and business done during a 12-month period.
The gross volume of sales made or business done means
the gross dollar volume (not limited to income) derived from
all sales and business transactions including, for example,
gross receipts from service, credit, or other similar charges.

29 C.F.R. § 779.259 (a).

The Court sees no reason to exclude income from the calculation of defendant's annual gross volume of sales made or business done.  The government grants and set aside payments are paid because of defendants' business enterprise, *to wit*, farming.  The rental payments from the house are derived from the same property which generates the agricultural income.  The Workers' Compensation refunds is income to the enterprise, presumably generated as a result of a reassessment of the business' risk of injury or utilization of insurance.  All of the income generated is deposited into the same bank account, tracked on the same spreadsheet and accounted for on a single income statement.  As Melinda Vizcarra testified at her deposition, "[w]e own one home and it's secured with all the land and equipment and buildings in Becker Farms . . . . We do everything together."   Dkt. #112, Exh. #, p.23.  As a result, the Court cannot determine that these revenues are not part of the defendants' enterprise.

Utilizing the income figures set forth on the 1999 tax returns, plus the payment from Mayer Brothers for $7,002.98, which defendants concede was income for 1999, defendants exceed the $500,000 threshold and are subject to the FLSA for 1999.  Dkt. #92-3; Dkt. #111, ¶ 7.

Defendants concede that their income exceeded the statutory threshold for 2000.  Dkt. #71-4, ¶ 6.

Although the total income for income for 2001 is $496,283.00, plaintiffs argue that because sales exceeded $500,000 in 2000, defendants are obligated to comply with the FLSA in 2001.  Dkt. #79-1, p.20; Dkt. #92-5.  In support of this argument, plaintiffs cite 29 C.F.R. § 779.265, which states:

> When gross receipts of an enterprise show that the annual dollar volume of sales made or business done meets the statutory tests for coverage and nonexemption, the employer must comply with the Act's monetary provisions from that time on or until such time as the tests are not met.

The enterprise may establish that it is no longer subject to the FLSA by utilizing the following calculation:

> In order to determine, when there may be doubt, whether an enterprise or establishment has an annual gross volume of sales made or business done in excess of the amount specified in the statute, an[] analysis will be made at the beginning of each quarter-year so that the employer will know whether or not the dollar volume tests have been met for the purpose of complying with the law in the workweeks ending in the current quarter-year.  The total of the gross receipts from all its sales or business during a 12-month period which immediately precedes the quarter-year being tested will be the basis for analysis.

29 C.F.R. § 779.266(b).  As the Court cannot discern from the financial information presented at what point this alternative test would have relieved defendants of their obligation to abide by the FLSA in 2001, the Court cannot grant summary judgement to the defendants on the FLSA claim for 2001.

<u>500 Man-Days/Agricultural Exemption</u>

Defendants argue that they are exempt from the FLSA because they did not utilize more than 500 man-days of agricultural labor during any calendar quarter

during the preceding year, as required pursuant to 29 U.S.C. § 213(a)(6)(A) .  Dkt. #71-5, p.20.   Defendants also argue that § 213(b)(12) of the FLSA provides an exemption from the application of § 207 of the FLSA.  Dkt. #71-5, p.31.

The FLSA does not apply to "any employee employed in agriculture . . . if such employee is employed by an employer who did not, during any calendar quarter during the preceding year, use more than five hundred man-days of labor."  29 U.S.C. § 213(a)(6)(A). [4]  A man-day is defined as "any day during which an employee performs any agricultural labor for not less than one hour."  29 U.S.C. § 203(u).  The regulations note that "500 man-days is approximately the equivalent of seven employees employed full-time in a calendar quarter."  29 C.F.R. § 780.305(a).  In addition, 29 U.S.C. § 213(b)(12) provides that the provisions of section 207, which require overtime wages, shall not apply with respect to "any employee employed in agriculture."  To be exempt under either provision, therefore, the employer must establish that the employee was employed in agriculture.

Plaintiffs argue that defendants cannot benefit from these exemptions because they routinely performed tasks outside of the definition of "employed in agriculture."  Dkt. #79-1, p.31.  In support of this argument, plaintiffs cite 29 U.S.C. § 780.11, which states:

> Where an employee in the same workweek performs work
> which is exempt under one section of the Act and also
> engages in work to which the Act applies but is not exempt

---

[4] This exemption also applies to the AWPA.  *See* 29 U.S.C. § 1803(a)(2).

> under some other section of the Act, he is not exempt that
> week, and the wage and hour requirements of the Act are
> applicable.

*See National Labor Relations Bd. v. Kelly Bros. Nurseries, Inc.*, 341 F.2d 433, 437 (2d

Cir. 1965) (employee outside of FLSA's agricultural exemption if he spent part of week

performing tasks outside of the definition of agriculture); *see also Adkins v. Mid-*

*American Growers, Inc.*, 167 F.3d 355, 359 (7th Cir. 1998)(It is true that a worker who

does any nonexempt work in a week is entitled to the statutory protections of the

FLSA);  *Hodgson v. Wittenburg*, 464 F.2d 1219, 1222 (5th Cir. 1972) ("an employee's

performance of both exempt and non-exempt activities during the same work week

defeats any exemption that would otherwise apply.").


To determine what tasks are exempt from the definition of "employed in

agriculture," the Court turns to the definition of agriculture, which is defined as:

> farming in all its branches and among other things includes
> the cultivation and tillage of the soil, dairying, the production,
> cultivation, growing, and harvesting of any agricultural or
> horticultural commodities (including commodities defined as
> agricultural commodities in section 1141j(g) of Title 12), the
> raising of livestock, bees, fur-bearing animals, or poultry,
> and any practices (including any forestry or lumbering
> operations) performed by a farmer or on a farm as an
> incident to or in conjunction with such farming operations,
> including preparation for market, delivery to storage or to
> market or to carriers for transportation to market.

29 U.S.C. § 203(f).  The regulations divide this definition into two categories: primary

agriculture and secondary agriculture.  29 C.F.R. § 780.105(a).  Primary agriculture

includes cultivation and tilling of soil, and growing and harvesting any agricultural

commodity.  29 C.F.R.  § 780.105 (b).  Secondary agriculture includes "any practices,

whether or not they are themselves farming practices, which are performed either by a farmer or on a farm as an incident to or in conjunction with 'such' farming operations." 29 C.F.R.  § 780.105 (c).

"The exemption was meant to embrace the whole field of agriculture," but "was meant to apply only to agriculture."  *Maneja v. Waialua Agricultural Co., Ltd.*, 349 U.S. 254, 260 (1955).   Otherwise, agricultural enterprises would enjoy "an artificial competitive advantage over enterprises that do not enjoy an exemption from the Fair Labor Standards Act."  *Adkins*, 167 F.3d at 359.   Secondary agriculture includes "[a]ssembling, ripening, cleaning, grading, sorting, drying, preserving, packing, and storing" fruits and vegetables, but does not include processing of fruits and vegetables from their natural state.  *Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1188 (10th Cir. 2004), *quoting* 29 C.F.R. § 780.15(b).  The "making of cider from apples" is specifically described as processing rather than agricultural production.   29 C.F.R. § 780.117(a).   Activities regarding agricultural products purchased from other sources, other than to make up for unforeseen shortages in the growers' own stock, are also outside of the definition of agriculture.  29 C.F.R. § 780.141; *see Wirtz v. Jackson & Perkins Co.*, 312 F.3d 48, (2d Cir. 1963).   Mowing the lawn and gardening around an employer's home on the farm, "clearly was nonexempt activity." *Adkins*, 167 F.3d at 359.

The employer "bears the burden" of demonstrating entitlement to the exemptions it seeks. *Rodriguez*, 360 F.3d at 1184, *citing Arnold v. Ben Kanowsky, Inc.*,

361 U.S. 388, 392 (1960) (exemptions under the FLSA "are to be narrowly construed against the employers seeking to assert them, and their application limited to those establishments plainly and unmistakably within their terms and spirit.").  The employee bears "the burden of proving that he did nonexempt work."  *Adkins*, 167 F.3d at 359.

          In the instant case, plaintiffs testified that they routinely engaged in tasks which would not fit within the definition of agriculture and would, therefore, void the exemption from the FLSA for the week in which they engaged in such tasks.  Dkt. #79-3, ¶ 5.  For example, Waldo Centeno-Bernuy testified at his deposition that he built a deck on the defendants' home, constructed display shelves for the retail store, and built benches for the spectators to watch the pig races, Dkt. #71, Exh. H, p.46; Dkt. #79-7, pp.10-11; Dkt. #79-9, pp.11-12.  Waldo Centeno-Bernuy also declares that he would accompany Oscar Vizcarra to another farm to transport Christmas trees to Becker Farms for resale.  Dkt. #79-26, ¶ 6.  Ruben Centeno-Bernuy declares that he began preparations for the haunted hayrides in August and worked the hayrides during October.  Dkt. #79-25, ¶¶ 3-4.  He also helped build an extension to the cafe for installation of a pie-baking oven.  Dkt. #79-25, ¶ 6.  Aquiles Galindo-Buendia testified that he cleaned and performed maintenance at the retail store, mowed grass around the retail store, parking lot and Vizcarra's home, maintained the gardens, yard and patio, parked cars for seasonal events, fed and cleaned the stalls of the llamas and sheep, trained the pigs and was responsible for the pigs during the pig races, prepared and supervised the bonfires during seasonal events, helped defendants' family members move, performed maintenance at defendants' home and the rental property,

assisted in the production of apple cider, peeled apples to make apple pies for sale in

the retail store, assembled boxes for pies, and put away the Halloween decorations.

Dkt. #71, Exh. K, pp.70-71 & 73; Dkt. #71, Exh. L, pp.17, 23-24, 36, 45, 48-49.


Oscar Vizcarra concedes that the H-2A workers helped make apple cider,

sometimes helped assemble pie boxes, constructed and maintained the labyrinth,

cooked at the chicken barbecues, worked the haunted hayrides and pig races, painted

the floors of the retail market, and landscaped his home.  Dkt. #71, Exh. M, pp.34, 112-

114, 225; Dkt. #79-19, pp.12-13; Dkt. #79-20, pp.1-16; Dkt. #79-21, pp. 7-11; Dkt. #79-

22, p.9.  Sally Ann Kneepel, an employee at Becker Farms, testified that the H-2A

workers would assemble pie boxes on rainy days and would help set up and clean up

for corporate picnics, which were scheduled approximately once a week during the

summer.  Dkt. #79-23.  Given the breadth of the non-exempt work performed by

plaintiffs, there is a material question of fact as to whether, during any particular

workweek, plaintiffs performed work which would preclude defendants from claiming an

exemption from the FLSA for "any employee employed in agriculture."


Willfulness

Defendants argue that any allegations pertaining to 1997, 1998 and 1999

are untimely pursuant to the FLSA's two-year statute of limitations.  Dkt. #71-5, p.24.


Plaintiffs argue that they are entitled to the three-year limitations period

because defendants' violation was willful.  Dkt. #79-1, p.36.   Accordingly, plaintiffs

assert that their claims for 1999, 2000, and 2001 are timely.  Dkt. #79-1, p.36.  Plaintiffs

are not seeking FLSA damages for work performed in 1997 and 1998.  Dkt. #79-1,

p.36, n.11.

The FLSA generally provides for a two-year statute of limitations on

actions to enforce its provisions, but allows a three-year limitations period for a "cause

of action arising out of a willful violation."  29 U.S.C. § 255(a).  To establish willfulness,

plaintiff must demonstrate "that the employer either knew or showed reckless disregard

for the matter of whether its conduct was prohibited by the statute."  *Herman v. RSR*

*Security Servs. Ltd.*, 172 F. 2d 132, 141 (2d Cir. 1999), *quoting McLaughlin v. Richland*

*Shoe Co.*, 486 U.S. 128, 133 (1988).

The Court finds that there is a question of fact whether defendants knew

or recklessly disregarded the possibility that the FLSA applied to plaintiffs.  If a jury finds

that the defendants had a valid basis for believing that they were exempt from the

provisions of the FLSA, *i.e.*, that they reasonably believed that they were entitled to rely

on the agricultural exemption, for example, defendants' failure to abide by the statute

cannot be deemed willful.  However, such an assessment cannot be made on the

current record as it is unclear what efforts defendants made to understand the legal

requirements of the FLSA.  Accordingly, it is recommended that defendants' motion for

summary judgment with respect to the first cause of action be denied and that the FLSA

claims for 1999, 2000 and 2001 be permitted to proceed.

**AWPA Cause of Action**

Plaintiffs' second cause of action alleges violations of the AWPA.  Dkt. #71, Exh. B.

Defendants argue that plaintiffs' status as H-2A workers excludes them from the protection of the AWPA.  Dkt. #71-5, p.19.

Plaintiffs respond that there is a material question of fact as to whether defendants' breach of the provisions of H-2A entitle them to protection pursuant to the AWPA.  Dkt. #79-1, p.42.

The AWPA affords certain protections to migrant agricultural workers and seasonal agricultural workers.  29 U.S.C. § 1802 (8) & (9).  However, the definition of migrant agricultural worker and seasonal agricultural worker explicitly excludes "any temporary nonimmigrant alien who is authorized to work in agricultural employment in the United States under sections 1101(a) (15)(H)(ii)(a) and 1184(c) of Title 8."  29 U.S.C. § 1802(8)(B)(ii) & (10)(B)(iii).  As there is no dispute that plaintiffs were authorized to work in agricultural employment pursuant to this statute, it is recommended that defendants' motion for summary judgment be granted with respect to the second cause of action alleging violation of the AWPA.

**New York Labor Law Cause of Action**

Plaintiffs' third cause of action alleges violations of New York's Labor Law. Dkt. #71, Exh. C.  Specifically, plaintiffs allege that defendants failed to pay plaintiffs at least the state-mandated minimum wage; failed to pay plaintiffs overtime; failed to maintain accurate records of hours worked; failed to pay plaintiffs on a weekly basis; and charged expenses against plaintiffs' wages.  Dkt. #71, Exh. B.


Overtime

Defendants argue that they are entitled to summary judgment on the overtime claim because New York does not mandate overtime wages for farm employees.  Dkt. #71-5, p.30.


Plaintiffs deny that farm workers are exempt from overtime compensation. Dkt. #79-1, pp.48-50.


"There are no provisions governing overtime compensation in the New York State Labor Law."  *Ballard v. Community Home Care Referral Serv., Inc.*, 264 A.D.2d 747 (2d Dep't 1999).   However, sections 653 and 655 of the New York Labor Law afford the Commissioner of Labor authority to investigate the sufficiency of the minimum wage statute and recommend, *inter alia*, regulations regarding overtime rates. *Id.*  Pursuant to those statutes, the Commissioner of Labor has determined that overtime compensation is appropriate and has issued the following order:

> An employer shall pay an employee for overtime at a wage
> rate of one and one-half times the employee's regular rate in

> the manner and methods provided in and subject to the
> exemptions of section 7 and 13 of 29 U.S.C. 201 *et seq*., the
> Fair Labor Standards Act of 1938, as amended.

12 N.Y.C.R.R. § 142-2.2.   However, the definitions set forth in Part 142 excludes "any individual permitted to work . . . as . . . [l]abor on a farm" from the definition of employee, noting that "[f]arm employees are covered under the provisions of the minimum wage order for farm workers, Part 190 of this Title, promulgated by the Commissioner of Labor pursuant to article 19-A of the New York State Labor Law."  12 N.Y.C.R.R. § 142-2.14(c)(3).  Part 190 generally defines an employee as "any individual engaged or permitted by an employer to work on a farm."  12 N.Y.C.R.R. § 190-1.3(b). However, Part 190 does not address overtime compensation for farm workers. Accordingly, it is recommended that defendants' motion for summary judgment with respect to plaintiffs' claim for overtime wages pursuant to New York Labor Law be granted.

<u>Willfulness</u>

Defendants seek dismissal of the claim seeking liquidated damages for willful non-payment of wages pursuant to New York Labor Law § 681 on the ground that there is no evidence of willful conduct.  Dkt. #71-5, p.30.

Plaintiffs argue that there is a question of fact as to whether defendants' actions were willful as that term is defined under New York law.  Dkt. #79-1, pp.48-50.

Section 681 of New York's Labor Law provides:

> If any employee is paid by his employer less than the wage
> to which he is entitled under the provisions of this article, he
> may recover in a civil action the amount of any such
> underpayments, together with costs and reasonable
> attorney's fees as may be allowed by the court, and if such
> underpayment was willful, an additional amount as liquidated
> damages equal to twenty-five percent of the total of such
> underpayment found to be due him and any agreement
> between him and his employer to work for less than such
> wage shall be no defense. `

In the context of prevailing wages, New York courts have stated that a finding of

willfulness is warranted if substantial evidence tends to demonstrate that the employer

knew or should have known that it was violating the law.  *See Consolidated Masonry*

*Contractors, Inc. v. Angello*, 2 A.D.3d 997, 998 (3rd Dep't 2003).  As set forth with

respect to the question of willfulness pursuant to the FLSA, however, such an

assessment cannot be made on the current record.  Accordingly, it is recommended

that defendants' motion for summary judgment with respect to plaintiffs' claim for

liquidated damages arising from defendants' willful underpayment of wages pursuant to

New York's Labor Law be denied.

**New York Warranty of Habitability Cause of Action**

Plaintiffs' fourth cause of action alleges violations of Section 235-b of New

York's Real Property Law, which sets forth a warranty of habitability.  Dkt. #71, Exh. B.

Defendants argue that plaintiffs cannot prevail on their claim of

inadequate housing conditions because the New York State Department of Labor

certified the housing as fit for occupancy every year from 1997 through 2001.  Dkt. #71-5, p.41.

Plaintiffs respond that despite the certification, which was granted prior to the arrival of the plaintiffs each year, there are questions of fact as to whether plaintiffs were subjected to unsanitary conditions such as sewage exposure and vermin, as well as insufficient hot water, a malfunctioning stove and washing machine, and faulty heaters.  Dkt. #79-1, p.53.

New York's warranty of habitability provides that:

In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety.

N.Y. Real Property Law § 235-b(1).  The Northern District of New York has determined that housing provided as part of a work agreement is subject to the warranty of habitability provision.  *See de la Cruz v. Gill Corn Farms, Inc.*, 2005 WL 5419057, at *9 (N.D.N.Y. April 13, 2005).  Applying these provisions to the facts presented, the Court finds that plaintiffs' affirmations of continuing unsanitary conditions, including sewage problems and rat infestations, which defendants acknowledge, are sufficient to permit the warranty of habitability claim to proceed.

**New York Human Rights Law Cause of Action**

Plaintiffs' fifth cause of action alleges violations of New York's Human Rights Law, as set forth in Executive Law § 290 *et seq*.  Dkt. #71, Exh. B.

Defendants argue that plaintiffs cannot demonstrate a *prima facie* case of discrimination.  Dkt. #71-5, p.44.

The New York Human Rights Law provides that it shall be an unlawful discriminatory practice for an employer, because of, *inter alia*, the race, color or national origin of any individual, to discriminate against such individual in compensation or in terms, conditions or privileges of employment.  N.Y. Executive Law § 296(1)(a).

> The standards for recovery under section 296 of the Executive Law are similar to the federal standards under title VII of the Civil Rights Act of 1964.  A three part analysis is required to determine whether plaintiffs have met their burden to establish a discrimination claim under Executive Law (Human Rights Law) § 296.  First, plaintiffs must demonstrate by a preponderance of the evidence a prima facie case of discrimination.

*Stephenson v. Hotel Employees & Restaurant Employees Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265, 270 (2006) (internal citations and footnote omitted).  To meet this burden, plaintiffs must show that (1) they are members of a protected class; (2) they were qualified to hold the position; (3) they suffered adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 (2004).  The burden then shifts to the defendants to rebut plaintiffs' *prima facie* case of

discrimination with a legitimate, nondiscriminatory reason for the adverse employment action. *Stephenson*, 6 N.Y.3d at 270. The plaintiffs must then show by a preponderance of the evidence that defendants' reasons are pretextual. *Id.*

Plaintiffs respond that there is sufficient evidence to demonstrate that plaintiffs were treated differently than their non-Peruvian co-workers and subjected to a hostile and offensive work environment. Dkt. #79-1, p.55. Specifically, plaintiffs argue that they were not provided with time sheets or included in the uniform record-keeping system utilized for non-Peruvian employees and that they were taunted and harassed by defendants. Dkt. #79-5, p.56. For example, plaintiffs allege that defendants allowed their white, U.S. citizen employees to record the hours they worked, and paid them for all hours worked, but failed to maintain accurate records or pay plaintiffs for each hour worked, thereby subjecting plaintiffs to adverse conditions of employment as compared to the white, U.S. citizen employees. Dkt. #71, Exh. B, ¶¶ 104-105.

Defendants concede that the plaintiffs were not required to record their hours or submit time sheets as the other workers were required to do. Dkt. #69-3, ¶ 24. However, defendants argue that, unlike the part-time employees working shifts in the retail shops, plaintiffs worked full-time and worked closely with Oscar Vizcarra, who kept track of plaintiffs' hours and reported them to Melinda Vizcarra for payroll. Dkt. #71-5, p.49. However, Oscar Vizcarra's deposition testimony that plaintiffs were so "desperate . . . that they'd say . . . bring us over there and whatever we do to make three dollars a day to help" and plaintiff Aquiles Mauro Galinda-Buendia's deposition

testimony that when he was underpaid for his first week of work, he "asked Mr. Oscar

Vizcarra, and he told me that I was earning more than in Peru," is sufficient, for

purposes of summary judgment, to show that defendants' proffered reasons for the

different practices for recording hours are pretextual.  Dkt. #69-12, p.174; Dkt. #132-8,

p.78.   Testimony from  Mr. Centeno-Bernuy that defendants told him he was from the

third world, called him sambo, negro and peon and from Mr. Galindo-Buendia that

defendants told him that Americans see him as dogs/bitches, also suggest

discriminatory animus.  Dkt. #79-1, pp.59-60.  Accordingly, it is the Court's opinion that

there remains a question of fact as to whether defendants discriminated against

plaintiffs with respect to compensation or other terms and conditions of employment

because they were Peruvian nationals.


**Breach of Contract Cause of Action**

Plaintiffs' sixth cause of action alleges breach of the employment contract.

Dkt. #71, Exh. B.


Defendants argue that plaintiffs statutory claim for reimbursement of

transportation and subsistence expenses are barred by a three-year statute of

limitations.  Dkt. #71-5, p.39.


Plaintiffs respond that this breach of contract claim is subject to a six-year

statute of limitations.  Dkt. #79-1, p.51.

The regulations implementing the H-2A worker program provide that an employer must pay an H-2A worker for transportation and subsistence costs if the worker completes 50 percent of the contract work period.  20 C.F.R § 655.102(b)(5)(i) & (ii).   This provision was included within the Clearance Orders, which constitute an employment contract between the employers and farmworkers.  *See Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1233 (11th Cir. 2002).   Accordingly, the Court finds that plaintiffs are entitled to proceed pursuant to a breach of contract theory, which is subject to a six-year statute of limitations.   It is, therefore, recommended that this aspect of defendants' motion for summary judgment be denied.

**Wagner-Peyser Act Allegations**

In a supplemental memorandum of law filed with permission of the Court subsequent to oral argument of their initial motion, defendants proffered two additional arguments in support of their motion for summary judgment.  Dkt. #132.  First, defendants argue that H-2A workers have no private right of action pursuant to the Wagner-Peyser Act, thereby justifying dismissal of their FLSA and New York Labor Law claims as well.  Dkt. #132.  Defendants also argue that plaintiffs' claims are barred due to their failure to exhaust administrative remedies afforded under the Wagner-Peyser Act.  Dkt. #132.

Plaintiffs respond that they have not asserted a cause of action pursuant to the Wagner-Peyser Act and that the absence of a private cause of action pursuant to those regulations, if true, would not preclude actions pursuant to other federal and state

statutes and common law, none of which require exhaustion of administrative remedies.

Dkt. #136.

Plaintiffs assert six causes of action: (1) FLSA; (2) AWPA; (3) New York

Labor Law; (4) New York Real Property Law; (5) New York Human Rights Law; and (6)

breach of contract.  Dkt. #71, Exh. B.  Thus, there is no cause of action pursuant to the

Wagner-Peyser Act to dismiss.  Plaintiffs cite the provisions of the Wagner-Peyser Act

within their complaint because these regulations were incorporated into the employment

contract between plaintiffs and defendants and because the alleged violation of these

regulations support plaintiffs' claims of willfulness and/or knowledge of their obligations

under the causes of action asserted by plaintiffs.

The case relied upon by defendants, *Nieto-Santos v. Fletcher Farms*,

does not support their argument that this Court lacks subject matter jurisdiction over

plaintiffs' complaint.  743 F.2d 638 (9th Cir. 1984).  In that case, plaintiffs did not claim

that they had been underpaid for work they actually performed for their employer, but

that their employer terminated the contract prior to the termination date specified.  *Id.* at

639. The Wagner-Peyser Act required that the contract include a guarantee of

employment for at least three-fourths of the workdays within the contract period.  *Id.* at

640.  Plaintiffs claimed that the district court had subject matter jurisdiction over their

breach of contract claim because the terms of that contract were governed by, *inter*

*alia*, the Wagner-Peyser Act.  *Id.* at 639.  The Court of Appeals simply determined that

a breach of contract claim did not become a federal cause of action "merely because Congress required that the contract include certain provisions." *Id.* at 641.  Similarly, the Court of Appeals of Kentucky, *citing Nieto-Santos*, determined that the Wagner-Peysner Act did not require that a party exhaust administrative remedies set forth pursuant to 29 C.F.R. § 501.0 *et seq.*, before filing a breach of contract action in state court.  *Aguirre v. Workman*, No. 1998-CA-001367, 2000 WL 34024458 (Ky. App. Dec. 8, 2000) (unpublished opinion).

In contrast, in *Arriaga v. Florida Pacific Farms, L.L.C.*, the Court of Appeals for the Eleventh Circuit stated that "[t]he protections of the minimum wage provisions of the FLSA indisputably apply to the [H-2A workers]."  305 F.3d at 1235.  In support of this conclusion, the Court of Appeals cited provisions of the Wagner-Peyser Act requiring compliance with applicable federal, state, and local employment-related laws and regulations.  *Id., citing* 20 C.F.R. § 655.103(b).  The Court also notes that there would be no need to exclude H-2A workers from the protections afforded by the AWPA if H-2A workers were limited to the remedies set forth under the Wagner-Peyser Act.  Accordingly, the Court recommends that defendants' motion to dismiss the complaint for lack of subject matter jurisdiction and failure to utilize the administrative process set forth under the Wagner-Peyser Act be denied.

**Breach of Contract Counterclaim**

Defendants assert an affirmative defense and counterclaim for breach of the employment contract.  Dkt. #2 & Dkt. #71, Exh. C.  Specifically, defendants assert

-33-

that plaintiffs terminated their employment before the completion date set forth in the

Clearance Order and failed to meet the minimum productivity and quality standards set

forth in the Clearance Order.  Dkt. #71, Exh. C.


Plaintiffs seek summary judgment dismissing the counterclaim.  Dkt. #69.

In support of their motion, plaintiffs argue that defendants breached the employment

contract before plaintiffs left their employment with Becker Farms, thereby relieving

plaintiffs from any duty to continue their performance under the contract, by failing to

provide plaintiffs with a copy of the Clearance Order, failing to reimburse plaintiffs their

transportation and subsistence expenses upon completion of 50% of the contract term,

and failing to maintain records of daily hours worked by plaintiffs.   Dkt. #69, p.11.

Plaintiffs also argue that the counterclaim constitutes retaliation, which is prohibited by

the FLSA.  Dkt. #69, p.25.


Defendants respond that there is a question of fact as to whether their

breaches of the employment contract are material and that there is no evidence that the

counterclaim was brought to retaliate against plaintiffs.  Dkt. #78-1, pp.3 & 9.


Employers are required to offer H-2A workers the terms of employment

set forth in the H-2A regulations.  *Salazar-Calderon v. Presidio Valley Farmers Assoc.*,

765 F. 2d 1334, 1342 (5th Cir. 1985), *cert. denied*, 475 U.S. 1035 (1986).  These terms

become a part of the employment contract as a matter of law.  *Frederick County Fruit

Growers Assoc., Inc. v. McLaughlin*, 703 F. Supp. 1021, 1031 (D. D. C. 1989).   The

employer is obligated to comply with these terms regardless of whether the employer has complied with its obligation to provide the employee with a copy of the Clearance Order.  *Id.*   Having failed to comply with their obligation to provide the plaintiffs with a copy of the Clearance Order, however, defendants should not be permitted to assert a breach of contract cause of action against the plaintiffs.  Stated another way, the Court believes that defendants' failure to provide the plaintiffs with a copy of the employment contract is a breach so substantial as to excuse any deficiency in plaintiffs' performance of that contract as a matter of law.  *See Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) ("A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract.").  The Court is hard pressed to identify a principle more fundamental than requiring a party to be made aware of the terms of an agreement before he can be sued for breach of it.  Accordingly, it is recommended that plaintiffs' motion for summary judgment with respect to defendants' affirmative defenses and counterclaim for breach of contract be granted.

## CONCLUSION

For the reasons set forth above, it is recommended that plaintiffs' motion (Dkt. #69), be **GRANTED** and that defendants' affirmative defenses and counterclaim for breach of contract be dismissed and that defendants' motion (Dkt. #70), be **GRANTED** insofar as it seeks dismissal of the plaintiffs' AWPA cause of action and claim for overtime compensation pursuant to the New York Labor Law, but **DENIED** with respect to the remaining causes of action.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority."  Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

DATED:      Buffalo, New York
            July 31, 2007

**S/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**